**UNITED STATES DISTRICT COURT**

**DISTRICT OF COLUMBIA**

JOHNMARK MAJUC,
1119 Elm Street
Utica, New York 13501

and

JOSEPH JOK,
4029 43rd Street
Apartment 405
San Diego, California 92105,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF JUSTICE,
950 Pennsylvania Avenue, NW
Washington, DC 20530,

Defendant.

Civil Action No.

**COMPLAINT**

Plaintiffs Johnmark Majuc and Joseph Jok, by their undersigned attorneys, allege:

**INTRODUCTION**

1. This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, challenging the refusal of the United States Department of Justice ("DOJ" or "Defendant") to disclose a narrow, clearly defined, and easily located set of records documenting the criminal conduct of the global bank and convicted felon BNP Paribas, S.A., and its affiliates ("BNPP"). The documents are of great interest and importance to certain Sudanese refugees, including Plaintiffs, now lawfully residing in the U.S. These refugees fled Sudan due to the serious human rights abuses, including genocide, being committed by the government of Sudan.

Though BNPP was convicted of participating in a criminal conspiracy with the government of Sudan to evade U.S. sanctions against Sudan, it now asserts in a separate proceeding in the U.S. District Court for the Southern District of New York, brought by certain of the refugees as a class action, that it should not be liable for the harm inflicted on those refugees by its co-conspirator, the government of Sudan, even though the sanctions were expressly designed to prevent such harm.

2. Plaintiff Johnmark Majuc, Plaintiff Joseph Jok, Turjuman Ramadan Adam, and Shafika Hassan (the "Requestors")[1] made a FOIA request (the "Request")[2] for the documents collected during the investigation by DOJ and other federal and New York state agencies of BNPP for its role in processing financial transactions for the government of Sudan. As a result of this investigation, BNPP pled guilty to violating U.S. sanctions and New York law.[3]

3. The documents sought are critical to the pending putative class action that Plaintiffs and other, similarly situated Sudanese refugees, who are now U.S. citizens or otherwise lawfully residing in the United States, have brought against BNPP for its role in the atrocities committed by the government of Sudan, entitled *Kashef, et al. v. BNP Paribas S.A., et al.*, No. 1:16-cv-03228 (S.D.N.Y., filed April 29, 2016) ("the *Kashef* Class Action"). BNPP's crimes and how they harmed Plaintiffs and the class in the *Kashef* Class Action are detailed in the 159-page Second Amended Complaint in that Action.[4]

4. These documents are the proper subject of a FOIA request, and DOJ's refusal to produce the documents is contrary to FOIA, and its statutory purpose to make information about

[1] Though Mr. Ramadan and Ms. Hassan submitted the Request with Plaintiffs, they are not parties to the instant Action.

[2] A true and correct copy of the Request is attached hereto as part of Exhibit 1.

[3] A true and correct copy of the Plea Agreement is attached hereto as Exhibit 2.

[4] A true and correct copy of the Second Amended Complaint, without exhibits, is attached hereto as Exhibit 3.

the activities of government agencies and officials available to the public and to do so in a timely manner.

5. Specifically, DOJ's refusal prevents details of BNPP's illegal activities from being available to the public. This protection of an admitted and convicted felon is contrary to FOIA and its purpose, as well as public policy.

6. In denying the FOIA request, DOJ asserted the exemption pursuant to 5 U.S.C. § 552(b)(7)(A), which permits withholding records or information compiled for law enforcement purposes when disclosure could reasonably be expected to interfere with enforcement proceedings ("Exemption 7(A)"). This blanket denial of the FOIA request on this basis, unaccompanied by any reasons or explanation, does not satisfy the government's burden to provide an account for why the withheld documents fall within this Exemption. It is also contrary to the fact that DOJ has already taken enforcement proceedings against BNPP, culminating in BNPP's guilty plea more than three years ago. Accordingly, any "enforcement proceedings" appear to have been completed with respect to the documents sought here, documents which relate to the time prior to the conviction. Thus, this response is insufficient to justify DOJ's withholding of these critical documents.

7. After issuing its insufficient, blanket denial, DOJ also rejected the Requestors' administrative appeal, again asserting Exemption 7(A) in cursory and inadequate terms.

8. In this action, Plaintiffs now seek declaratory, injunctive, and other relief for DOJ's failure to fulfill its statutory obligations. Plaintiffs also seek expedited treatment of this Complaint pursuant to 28 U.S.C. § 1657.

**THE PARTIES**

9. Plaintiff Johnmark Majuc ("Majuc") is a refugee from Bahr el Ghazal state in southern Sudan. In April-May 1998, government soldiers came to Majuc's village looking for

boys to recruit to fight in militias on behalf of the government of Sudan. Majuc fled into the bush to hide from the soldiers, who were shooting at him. The soldiers tortured and beat Majuc's mother, burned his family's home and crops, and took or killed his family's cattle. Majuc eventually went to the Sudanese village of Chukudum, where government-backed forces indiscriminately dropped bombs from modified Antonov cargo planes. In 1999, Majuc fled again to the Kakuma refugee camp in Kenya. In or about early 2001, Majuc was resettled in the United States. He is now a U.S. citizen, residing in Utica, New York. Majuc is a representative plaintiff in the *Kashef* Class Action.

10. Plaintiff Joseph Jok ("Jok"), a member of the Dinka ethnic group, was born in Bor, southern Sudan, and was lawfully admitted to the United States as a refugee. He is now a U.S. citizen, residing in San Diego, California. In or about 2003, Jok provided seed funding for his nephew's mobile phone distribution business in Malakal, southern Sudan. By 2009, the business prospered and the family built two homes there. In or about March 2009, two weeks after Jok returned to the United States from a visit to Malakal, a government of Sudan proxy militia led by Gabriel Tanginye looted and destroyed the family's business and homes. As a result of BNPP's criminal actions, the government of Sudan had substantial financial resources that it would otherwise not have had and used those resources to acquire military hardware and fund militia that it then used to harm Jok. Jok is a representative plaintiff in the *Kashef* Class Action.

11. Defendant United States Department of Justice is a department within the Executive branch of the United States government and an agency of the United States within the meaning of 5 U.S.C. § 522(f)(1).

**JURISDICTION AND VENUE**

12. This Court has subject-matter jurisdiction over this action and personal jurisdiction over the defendant pursuant to 5 U.S.C. § 552(a)(4)(B). This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. §§ 701-06.

13. Venue is proper in this district under 5 U.S.C. § 552(a)(4)(B).

## FACTS

### The Criminal Plea Agreement Between Defendant and BNPP

14. On June 29, 2014, BNPP entered into a criminal plea agreement with DOJ (the "Plea Agreement").[5] The plea was the result of a years-long investigation into BNPP by DOJ and also numerous other federal and New York state agencies. Five separate U.S. and New York entities—the Federal Reserve Board of New York, the U.S. Department of the Treasury's Office of Foreign Assets Control, the New York Department of Financial Services, the New York County District Attorney's Office, and DOJ—investigated BNPP's illicit financial dealings with Sudan. As a result of the investigations, BNPP had to pay criminal forfeitures totaling approximately $8.9 billion, one of the largest criminal fines in the history of the world.

15. Some of the facts DOJ learned during the course of its investigation were set forth in a "Statement of Facts."[6] The Statement was incorporated into the Plea Agreement, and BNPP "admit[ted] the facts set forth in the Statement . . . and agree[d] that those facts establish guilt of the offense charged [ ] beyond a reasonable doubt."[7]

16. The Plea Agreement and the Statement of Facts set forth BNPP's decade-long criminal conspiracy, from 1997 to 2007, with the government of Sudan, government of Sudan officials, numerous Sudanese banks and other entities, and other non-Sudan based financial institutions to violate U.S. sanctions on Sudan. Presidents William J. Clinton and George W.

---

[5] *See* Exhibit 2.
[6] A true and correct copy of the Statement of Facts is attached hereto as Exhibit 4.
[7] Exhibit 2 at 2.

Bush used their authority under the International Emergency Economic Powers Act and the Trading with the Enemy Act to place the sanctions on Sudan. Both Presidents intended for the sanctions to prevent the rampant human rights abuses that were occurring in Sudan.

17. This intent was evident from the text of the Executive Orders imposing the sanctions. For example, the executive order signed by President Clinton said that the sanctions were a response to the government of Sudan's actions "'including . . . the prevalence of human rights violations, including slavery and the denial of religious freedom.'"[8] Similarly, President Bush's Executive Order described:

> the "continuation of the threat to the national security and foreign policy of the United States created by certain policies and actions of the Government of Sudan that violate human rights, in particular with respect to the conflict in Darfur, where the Government of Sudan exercises administrative and legal authority and pervasive practical influence…."[9]

18. When BNPP agreed to violate the sanctions, it also agreed to provide Sudan with access to the U.S. financial system, *i.e.*, the very thing that the sanctions were designed to prevent. Over the course of its unlawful conduct, BNPP processed thousands of U.S. dollar denominated transactions, totaling "well in excess of $6 billion,"[10] including transactions worth approximately $4 billion that BNPP processed on behalf of "Specially Designated Nationals," or "SDNs."[11] SDNs are individuals or companies that the U.S. Department of the Treasury's Office of Foreign Assets Control,

> specifically designated as having their assets blocked from the U.S. financial system by virtue of being owned or controlled by, or acting for or on behalf of, targeted countries, as well as individuals, groups, and entities, such as terrorists

---

[8] Statement of Facts ¶ 3 (quoting Exec. Order No. 13067 (Nov. 3, 1997)) (Ex. 4 at 2).
[9] *Id.* ¶ 4 (quoting Exec. Order No. 13412 (Oct. 13, 2006)) (Ex. 4 at 3).
[10] *Id.* ¶ 17 (Ex. 4 at 6-7).
[11] *Id.* ¶¶ 2, 17 (Ex. 4 at 2, 6-7).

and narcotics traffickers, designated under sanctions programs that are not country-specific.[12]

19. BNPP's actions resulted in Sudan's having access to sell goods, including oil, for dollars and the ability to purchase goods in dollars.

20. In addition, BNPP's actions resulted in Sudan's maximizing the prices it obtained for its oil because, due to longstanding and economically compelling market forces, international oil transactions are priced in U.S. dollars ("petrodollars"). These transactions are overwhelmingly cleared through financial intermediaries in New York City that have large dollar deposits. Sudan, therefore, needed access to the U.S. financial system to maximize its future oil revenue. Conversely, if a country like Sudan desired to sell oil without access to U.S. dollars and the ability to clear transactions in New York, or elsewhere in the United States, it would suffer by selling its goods for substantial discount, either having to barter its oil in exchange for other goods or sell it in other currencies. Thus, Sudan had greater resources than it would have had but for BNPP's criminal conduct.

21. BNPP apparently used two main methods to hide its crimes. First, BNPP purposefully changed the payment messages accompanying transactions for Sudan. Such messages are one way in which banks in the United States ensure that they do not process transactions for sanctioned entities. Each message typically includes the name of the transaction's beneficiary. Financial institutions screen the message to see if the beneficiary is sanctioned and, if it is, they will block the transaction. When BNPP removed the references to the government of Sudan and other related entities from the payment messages, it precluded these transactions from being stopped.[13] Second, BNPP moved funds, on behalf of Sudanese

[12] *Id.* ¶ 2 (Ex. 4 at 2).
[13] *See id.* ¶ 18 (Ex. 4 at 7).

entities, through BNPP's own accounts at unaffiliated banks, known as "satellite banks." These satellite banks then transferred the funds to other U.S. financial institutions, believing the money to belong to BNPP.[14]

22. In the Plea Agreement, BNPP pled guilty to one count of,

> conspiracy to commit an offense against the United States in violation Title 18, United States Code, Section 371, by conspiring to violate the International Emergency Economic Powers Act [ ], codified at Title 50, United States Code, Section 1701 *et seq.*, and regulations issued thereunder, and the Trading with the Enemy Act ("TWEA"), codified at Title 50, United States Code Appendix, Section 1 *et seq.*, and regulations issued thereunder.[15]

23. BNPP also entered into a plea agreement with the New York County District Attorney's Office, pursuant to which it pled guilty to one count of Falsifying Business Records in the First Degree[16] and one count of Conspiracy in the Fifth Degree.[17]

24. Despite BNPP's criminal conviction and its payment of billions of dollars in fines, BNPP has not paid even a dollar to its victims. Nor did its victims receive any money from the fines paid. To force BNPP to pay damages, plaintiffs, including Plaintiffs Majuc and Jok, filed the *Kashef* Class Action in April 2016. The *Kashef* Class Action is of crucial importance because of the extraordinary harm suffered by the plaintiffs and the putative class therein. This grave harm is detailed extensively in the Second Amended Complaint.

25. In the *Kashef* Class Action, the plaintiffs assert various claims, including those arising from BNPP's admitted criminal conspiracy with the government of Sudan. Under the black letter law of conspiracy, a co-conspirator is liable for all foreseeable harm even if the co-conspirator itself does not inflict that harm directly. As an admitted co-conspirator, a primary

---

[14] *See id.* ¶¶ 23-24 (Ex. 4 at 10-11).
[15] Ex. 2 at 1.
[16] *See* N.Y. Penal Law § 175.10.
[17] *See* N.Y. Penal Law § 105.05.


issue in the *Kashef* Class Action is whether the harm to the putative class caused by the human rights violations in Sudan was foreseeable. Given that the sanctions were intended, according to Presidents Clinton and Bush, to prevent such human rights violations, plaintiffs assert that the harms caused to them were foreseeable by BNPP.

26. Nonetheless, BNPP has refused to admit liability and, instead, has moved to dismiss plaintiffs' Second Amended Complaint in the *Kashef* Class Action. The motion to dismiss is currently pending.

27. In the *Kashef* Class Action, the plaintiffs rely on the Plea Agreement and the public documents about DOJ's criminal investigation of BNPP, which ended on June 30, 2014. However, the information in these documents is obviously incomplete and does not provide the full picture of BNPP's crimes. Plaintiffs Majuc and Jok now seek documents obtained by DOJ in its investigation because they want to understand, in full, BNPP's role in the horrendous acts that Sudan perpetrated against them and their fellow refugees. Thus, although not required for a FOIA request, they have a legal interest in substantiating their claims against BNPP.

28. Indeed, Plaintiffs Majuc and Jok, who are now American citizens, want to be "in the know about their government."[18] They want to know and understand the facts of one of the greatest crimes in history as demonstrated by BNPP's approximately $8.9 billion in criminal forfeitures. And they do not understand or agree that their government should refuse to produce documents shedding light on those crimes when the only beneficiary of that refusal is a convicted felon.

[18] *See* https://www.foia.gov/about.html.

29. To that end, Plaintiffs' requested documents are identified by categories tailored to gather specific details and information on exactly how BNPP facilitated the Sudanese government's heinous crimes.

30. Plaintiffs seek documents reflecting the thousands of financial transactions facilitated by BNPP. Plaintiffs want to understand not only how BNPP carried out each of these transactions but also the nature of each transaction.

31. The documents may provide Plaintiffs with answers about how much BNPP's knew about the transactions it performed for the government of Sudan, including the exact purpose of the transactions. For example, Plaintiffs seek information to determine whether BNPP facilitated a transaction for Sudan's purchase of uniforms for its military and militias. If true, this fact would demonstrate the depravity of BNPP's actions. The government of Sudan used its uniform-wearing military and militia to make civilians fear for their lives.

32. Plaintiffs also seek documents reflecting BNPP's internal discussions about their actions and knowledge of U.S. sanctions and the human rights abuses that were occurring in Sudan. This information would assist Plaintiffs in understanding better the scope of BNPP's conspiracy and intent to violate U.S. sanctions.

33. Though the Plea Agreement provides certain excerpts from internal BNPP documents, Plaintiffs are entitled to discover the full scope of the information contained in the requested documents.

**Plaintiffs' FOIA Request and DOJ's Subsequent Denial**

34. On November 17, 2016, the Requestors, by and through their counsel, McKool Smith, P.C., submitted their Request to Karen McFadden, the FOIA Contact in the Justice

Management Division of DOJ. The Requestors set forth their specific, narrow list of documents in an exhibit to the Request. Some of these specific requests include:

a. "All Documents that mention or relate to BNPP and the war, militarization, violence or human rights abuses in Sudan, including but not limited to BNPP's knowledge that its actions supported the war, militarization, violence and human rights abuses in Sudan."
b. "All Documents that mention or relate to Sudan's oil industry and the growth of its oil revenue."
c. "All Documents that mention or relate to the 'Specially Designated Nationals,' as referenced in the [Statement of Facts], including Documents sufficient to identify the 'Specially Designated Nationals.'"
d. "All Documents that mention or relate to 'U.S. Bank 1,' as referenced in the [Statement of Facts], including Documents sufficient to identify 'U.S. Bank 1.'"
e. "All Documents that mention, support, or relate to the following statement in the [Statement of Facts]: 'In July 2005, for example, a BNPP Geneva employee noted how high-level business managers at BNPP were aware of and supported the transactions involving Sudan . . . .'"
f. "All documents that mention or relate to the amount of money the [government of Sudan] spent on its military."[19]

35. The Requestors submitted their Request via electronic mail and U.S. Post to Ms. McFadden.[20]

36. More than a month later, on December 30, 2016, DOJ's FOIA/PA Unit Chief, Amanda Jones, sent a letter acknowledging receipt of the Request.[21]

37. By letter dated April 21, 2017, DOJ denied the entirety of the Request (the "Request Denial").[22] The Request Denial simply stated that "all responsive records are exempt from disclosure pursuant to Exemption 7(A), which permits withholding records or information compiled for law enforcement purposes when disclosure could reasonably be expected to

---

[19] Request Nos. 3, 5, 10, 23, 24, 33 (Ex. 1 at 4-6).
[20] A true and correct copy of the email transmitting the Request to Ms. McFadden is attached hereto as Exhibit 5.
[21] A true and correct copy of the December 30, 2016 letter is attached hereto as Exhibit 6.
[22] A true and correct copy of the Request Denial is attached hereto as Exhibit 7.

interfere with enforcement proceedings."[23] Beyond its flat-out refusal to provide any records and its barebones invocation of Exemption 7(a), DOJ provided no further information.

**Plaintiff's Administrative Appeal**

38. On July 20, 2017, the Requestors filed an administrative appeal of the Request Denial, (the "Appeal").[24] A true and correct copy of the Appeal is annexed as Exhibit 8.

39. The Appeal emphasized that the records requested qualified for disclosure under FOIA and that the summary Request Denial was inadequate because DOJ, as "the agency invoking Exemption 7(A) may not simply assert that it applies to every responsive document."[25] Rather, DOJ "must demonstrate *how* disclosure will interfere with enforcement proceedings," which are "concrete" and "*prospective*."[26]

40. The Appeal then explained that DOJ "failed to identify any concrete enforcement proceeding, let alone a *prospective* one."[27]

41. Further, the Denial failed to provide "the required document-by-document explanation as to how disclosure would interfere with the prospective proceeding."[28] Thus the Denial was inadequate, and DOJ should have disclosed the requested records.

42. On July 21, 2017, and again on August 4, 2017, DOJ sent letters acknowledging receipt of the Appeal.[29]

43. By letter dated August 22, 2017, Matthew Hurd, Associate Chief for Administrative Appeals for DOJ's Office of Information Policy, denied the Appeal (the "Appeal

---

[23] *Id.* at 1 (citing 5 U.S.C. § 552(b)(7)(A)).
[24] A true and correct copy of the Appeal is attached hereto as Exhibit 8.
[25] *Id*. at 2.
[26] *Id.* (quotations and citations omitted).
[27] *Id*.
[28] *Id*.
[29] True and correct copies of the July 21, 2017 and August 4, 2017 letters are attached hereto as Exhibits 9 and 10, respectively.

Denial").[30] By way of reasoning, in terms perhaps even more conclusory than those in the Request Denial, the Appeal Denial merely stated that "[t]he Criminal Division properly withheld this information in full because it is protected from disclosure under the FOIA pursuant to [Exemption 7(A)] and it is reasonably foreseeable that disclosure of this information would harm the interests protected by this provision."[31]

44. Requestors have therefore exhausted their administrative remedies and now bring this action pursuant to 5 U.S.C. § 552(a)(4)(B).

**The Compelling Public Interest in the Requested Records**

45. As set forth above and in the documents relating to BNPP's plea agreement, BNPP perpetrated a massive, decade-long criminal conspiracy designed to enrich itself and the government of Sudan, knowing that Sudan would then use those resources to harm its own civilians, including Plaintiffs, in the most horrendous ways possible.

46. BNPP illegally provided U.S. dollars to the very actors who violated Plaintiffs' human rights, during the very period of time when BNPP knew those injuries were being inflicted. BNPP knew, or should have known, that its actions would have this result because the U.S. sanctions that it pled guilty to violating were designed to protect Plaintiffs and those that are similarly situated, including the plaintiffs in the *Kashef* Class Action. In fact, Plaintiff's injuries were not only foreseeable, but were actually foreseen by BNPP. BNPP knew that these financial transactions allowed the government of Sudan to exploit its oil resources and understood that subsequent financial gains would be used by the government of Sudan to fund its human rights abuses against its own citizens. Not only was the link between oil and human rights abuses internationally notorious due to, among other reasons, extensive media coverage and official

---

[30] A true and correct copy of the Appeal Denial is attached hereto as Exhibit 11.
[31] *Id*. at 1.

reports by the United Nations, but BNPP's own employees recognized its role in supporting terrorism and human rights violations.[32]

47. The records requested by Plaintiffs are relevant to issues of ongoing public interest. The public has an ongoing interest in knowing the details of how BNPP, one of the leading banks in the world, abused its access to U.S. dollars and the U.S. banking system to perpetrate a massive criminal conspiracy with the government of Sudan in violation of multiple laws, a conspiracy that resulted in injuries to thousands of human beings who are now U.S. citizens and permanent residents and death to thousands of others, including family members of those now in the U.S. The public's interest is particularly critical here where the information sought concerns one of the worst human rights catastrophes in recent history: the human rights abuses, including the genocide in Darfur, committed by the government of Sudan and those who aided them. The public's interest is also in obtaining justice for those injured by Sudan and those who aided them. Here, the failure to disclose the records of a convicted felon only serves to benefit the convicted felon, not justice.

48. There is no legally justifiable reason for DOJ to withhold these critical documents.

## CAUSE OF ACTION

## (Violation of FOIA for Failure to Disclose Records)

1. Plaintiffs repeat, reallege, and incorporate the allegations in the foregoing paragraphs as though fully set forth herein.

2. Defendant's failure to make available and to release the records requested by plaintiffs violates FOIA, 5 U.S.C. §§ 552(a)(3)(A), 552(a)(6)(A).

## RELIEF REQUESTED

[32] Statement of Facts ¶ 20 (Ex. 4 at 8).

**WHEREFORE,** Plaintiffs respectfully pray that this Court:

a. expedite consideration of this Complaint pursuant to 28 U.S.C. § 1657;

b. declare that Defendant violated FOIA by not disclosing the records sought in Plaintiffs' Request;

c. enjoin Defendant immediately and expeditiously to provide to Plaintiffs the records sought in Plaintiffs' Request;

d. award Plaintiffs the costs of this proceeding, including reasonable attorneys' fees and costs; and

e. grant such other and further relief as the Court deems just and proper.

Dated: March 13, 2018.

Respectfully submitted,

**MCKOOL SMITH, P.C.**

/s/ Tiffany Heavlin

Kathryn Lee Boyd [*pro hac vice* to be filed]
Thomas B. Watson [*pro hac vice* to be filed]
McKool Smith Hennigan, P.C.
300 South Grand Avenue Suite 2900
Los Angeles, C.A. 90071
Telephone: (213) 694-1200
Fax: (213) 694-1234

Elizabeth Curran [*pro hac vice* to be filed]
McKool Smith, P.C.
One Bryant Park, 47th Floor
New York, N.Y. 10036
Telephone: (212) 402-9400
Fax: (212) 402-9444

Tiffany Heavlin [D.C. Bar No. 1020997]
McKool Smith, P.C.
1999 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 370-8300
Fax: (202) 370-8344

**ATTORNEYS FOR PLAINTIFFS**