UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JOHNMARK MAJUC and JOSEPH JOK, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 18-cv-566 (APM) |
| U.S. DEPARTMENT OF JUSTICE, | ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OPINION**

**I.**

In this Freedom of Information Act ("FOIA") case, the court previously held that Defendant Department of Justice had failed to support its categorical withholdings of all responsive records pursuant to Exemption 7(A). *See Majuc v. U.S. Dep't of Just.* (Majuc I), No. 18-cv-00566 (APM), 2019 WL 4394843, at *2 (D.D.C. Sept. 13, 2019). The court denied summary judgment. *Id.* at *4. Defendant now tries again. This time it succeeds. For the reasons that follow, the court grants Defendant's motion for summary judgment.

**A.**

The records sought in this case relate to a criminal investigation of BNP Paribas, S.A. ("BNPP") and its affiliates for evading economic sanctions against various countries, including Sudan. *Id.* at *1. In 2014, BNPP pleaded guilty to conspiracy to violate the International Emergency Economic Powers Act and Trading with the Enemy Act. *Id.* It completed a five-year term of probation in 2020. Def.'s Mot. for Summ. J., ECF No. 70 [hereinafter Def.'s Mot.], Decl. of Courtney O'Keefe, ECF No. 70-3 [hereinafter O'Keefe Decl.], ¶ 44.

Plaintiffs are two Sudanese refugees who are members of a class action lawsuit against BNPP, which seeks to hold the bank responsible for its role in human rights abuses committed by the Sudanese government from 1997 to 2009.  *See Kashef v. BNP Paribas SA*, No. 16-cv-3228 (AJN), 2021 WL 603290 (S.D.N.Y. Feb. 16, 2021).  In November 2016, Plaintiffs submitted a FOIA request to Defendant for 33 categories of records.  O'Keefe Decl. ¶ 6; *id.* Ex. A.[1]  Broadly speaking, the request sought all documents "gathered" or "created" in connection with Defendant's investigation of BNPP's violations of law "with respect to BNPP's dealings with Sudan."  *Id.* Ex. A at 23.  Defendant resisted producing any records in response.  *Majuc I*, 2019 WL 4394843, at *1.  It invoked a variety of exemptions but asserted Exemption 7(A) as to all records.  *See id.*  As noted, after an initial round of summary judgment briefing, in September 2019, the court rejected as inadequate Defendant's categorical invocation of Exemption 7(A).  *See id.* at *2.

B.

After the court's decision, the parties reached agreement on search terms and other aspects of Plaintiffs' request.  Joint Status Report, ECF No. 43.  One search term produced nearly 70,000 records, which Defendant estimated might entail close to one million pages.  Joint Status Report, ECF No. 44.  The parties then agreed to narrow the scope of the search and prioritize certain records.  Joint Status Report, ECF No. 48.  That winnowing still produced over 100,000 pages, which Defendant then began to process over the course of months.  Joint Status Reports, ECF Nos. 52, 54, 57, 59, 61.

Eventually, Defendant produced two "interim" responses.  On September 22, 2020, Defendant advised that it had reviewed 888 pages of records but intended to withhold all of them based on Exemptions 3, 4, 6, 7(A), and 7(C).  O'Keefe Decl. Ex. F.  Then, on November 20, 2020,

---

[1] Citations to the exhibits to the O'Keefe Declaration reference CM/ECF pagination.

2

Defendant informed Plaintiffs that it had reviewed an additional 825 pages but that, as before, it intended to withhold all records pursuant to Exemptions 4, 6, and 7(C). *Id.* Ex. G.

These non-disclosures prompted the instant round of summary judgment briefing. The parties agreed that Defendant would suspend processing of additional documents and that they would proceed to contest the exemptions asserted in the two interim responses. Joint Status Report., ECF No. 66. Defendant then moved for summary judgment. Def.'s Mot. It took a categorical approach, organizing the withheld records into eight groups: (1) "Interview Summary Memoranda," (2) "BNPP Transactional Data Chart," (3) "Emails," (4) "Document Production Indices," (5) "Presentation to Government," (6) "Internal BNP Presentations," (7) "Compliance Memoranda," and (8) "Advice Memoranda from Outside Counsel." O'Keefe Decl. Ex. H [hereinafter Records Index]. Defendant asserted various exemptions to justify the withholdings, including Exemptions 3, 4, 6, 7(A), and 7(C). *See id.*

## II.

### A.

Before turning to the withholdings, the court takes up two threshold contentions made by Plaintiffs. First, Plaintiffs contest the categorical approach taken by Defendant. They contend that the "categories are—on their face—impermissibly overinclusive," the "descriptions of each category do little more than echo the language of FOIA's exemptions in conclusory fashion," and the index "lacks both substantive detail and the metadata typically included in a comprehensive *Vaughn* Index." Pls.' Opp'n to Def's Mot. for Summ. J., ECF No. 73, Pls.' Mem. in Opp'n to Def.'s Mot. for Summ. J., ECF No. 73-1 [hereinafter Pls.' Opp'n], at 6–7. The court disagrees.

Ordinarily, an agency must "provide the requestor with a description of each document being withheld[] and an explanation of the reason for the agency's nondisclosure." *Oglesby v.*

*U.S. Dep't of the Army*, 79 F.3d 1172, 1176 (D.C. Cir. 1996). But when "the FOIA litigation process threatens to reveal the very information the agency hopes to protect," the agency may limit the information in its affidavits to just "brief or categorical descriptions of the withheld information." *Citizens for Responsibility & Ethics in Washington* (*CREW*) *v. U.S. Dep't of Just.*, 746 F.3d 1082, 1088 (D.C. Cir. 2014) (internal quotation marks omitted). In that circumstance, the agency can "justify withholding or redacting records 'category-of-document by category-of-document' rather than 'document-by-document.'" *Am. Immigr. Lawyers Ass'n v. Exec. Off. for Immigr. Rev.*, 830 F.3d 667, 675 (D.C. Cir. 2016) (quoting *CREW*, 746 F.3d at 1088). When, as here, an agency takes a categorical approach with respect to law enforcement records, it "has a three-fold task. First, it must define its categories functionally. Second, it must conduct a document-by-document review in order to assign documents to the proper category. Finally, it must explain to the court how the release of each category would interfere with enforcement proceedings." *Bevis v. Dep't of State*, 801 F.2d 1386, 1389–90 (D.C. Cir. 1986).

The *Vaughn* Index in this case satisfies each of these requirements. The *Vaughn* Index consists of five documents: (1) the publicly filed Declaration of Courtney J. O'Keefe ("O'Keefe Declaration"), *see generally* O'Keefe Decl.; (2) a spreadsheet attached to the O'Keefe Declaration that describes the records withheld ("Records Index"), *see id.*, Records Index, at 48–56; (3) the Ex Parte Declaration of Courtney J. O'Keefe; (4) the Supplemental Declaration of Courtney J. O'Keefe, Def.'s Reply Mem. in Supp. of Mot. for Summ. J., ECF No. 75, Second Decl. of Courtney J. O'Keefe, ECF No. 75-1 [hereinafter Suppl. O'Keefe Decl.]; and (5) the Second Ex Parte Declaration of Courtney J. O'Keefe. *See CREW*, 746 F.3d at 1088 ("Agency affidavits sometimes take the form of a '*Vaughn* index,' but there is 'no fixed rule' establishing what such an affidavit must look like." (citations and internal quotation marks omitted)). O'Keefe explains

that the withheld records "consist entirely of business records submitted by BNPP to the Department of Justice during the course of the Department's investigation into and prosecution of BNPP for violations of U.S. laws." O'Keefe Decl. ¶ 25. The agency grouped these records into eight categories. *See* Records Index. Each category, as reflected in the Records Index, is described in some detail. For example, the description of the first group of records—"Interview Summary Memoranda"—is as follows:

> Memoranda prepared by outside counsel for BNPP that are marked as FOIA/FOIL Confidential. These memoranda summarize interviews of BNPP employees conducted by outside counsel as part of an internal review of BNPP's compliance with U.S. sanctions laws and financial embargoes against countries, including Sudan.
>
> Among other things, the memoranda reflect outside counsel for BNPP's interview strategy, refer to the interviewee's position and responsibilities within BNPP, cover the employees' knowledge of payment systems and processes within BNPP, discuss interactions with BNPP personnel and compliance departments, knowledge of U.S. economic sanctions or embargoes pertaining to specific countries, and BNPP's handling of U.S. economic sanctions or embargoes of countries including Sudan.

*Id.* at 48–49. A similarly detailed description is repeated for each of the seven remaining categories. *Id.* at 50–56. As to each category, the Records Index sets forth the number of pages withheld, identifies the exemptions relevant to each category, and provides a short summary justification of the asserted exemption. *Id.* Greater explanations as to the reasons for the exemptions can be found in O'Keefe's Declarations. O'Keefe Decl. ¶¶ 26–49; Ex Parte O'Keefe Decl. ¶¶ 8–22; *see also Morley v. CIA*, 508 F.3d 1108, 1122 (D.C. Cir. 2007) (stating that the agency "must provide a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply" (internal quotation marks omitted)). By any measure, the *Vaughn*

5

Index in this case is detailed and comprehensive. It easily satisfies the requirements of a categorical approach.[2] *See Bevis*, 801 F.2d at 1390 (accepting grouping of records described as "the identities of possible witnesses and informants," "reports on the location and viability of potential evidence," and "polygraph reports," but not categories identified as "teletypes," "airtels," or "letters").

Second, Plaintiffs challenge the sufficiency of the publicly filed O'Keefe Declaration. They maintain that the Declaration is "conclusory and short on detail" and "lacks an evidentiary foundation for key factual assertions." Pls.' Opp'n at 9. In particular, Plaintiffs complain that O'Keefe has no "personal knowledge of BNPP's commercial interests" and therefore her representations regarding BNPP and Exemption 4 "have no probative value." *Id.* at 10–11. Neither argument has merit. To the extent the O'Keefe Declaration is "conclusory and short on detail"—and the court is not suggesting it is either—the ex parte submission more than fills in the gaps. As for their complaint that O'Keefe lacks personal knowledge when asserting BNPP's commercial interests, O'Keefe states that the statements made are "on the basis of personal knowledge" and "on information provided to me by others within the Criminal Division with knowledge of the search and documents at issue in this case and on information acquired by me in the course of performing my official duties in the FOIA/PA Unit." O'Keefe Decl. ¶ 5. Specifically, O'Keefe reviewed all of the withheld records and "had multiple substantive discussions with an attorney in the Criminal Division's Money Laundering and Asset Recovery Section ('MLARS') who was involved in the Department's investigation into and prosecution of BNPP for violations of U.S. laws" and "an MLARS subject matter expert who handles

---

[2] A fuller discussion of the third requirement—how records release would with interfere law enforcement proceedings—appears below.

investigations and prosecutions involving financial institutions." Suppl. O'Keefe Decl. ¶ 6. Courts routinely have held that declarants in FOIA cases can rely on information obtained through inter-agency consultations without running afoul of hearsay rules. *See Leopold v. U.S. Dep't of Just.*, No. 19-cv-3192 (RC), 2021 WL 124489, at *4 (D.D.C. Jan. 13, 2021) (citing cases). O'Keefe therefore cannot be characterized to lack "personal knowledge" of the statements set forth in her various declarations.[3]

**B.**

The court now turns to the exemptions asserted to withhold all records. As noted, at issue are Exemptions 3, 4, 6, 7(A), and 7(C). *See* Records Index. The agency withheld the first six of eight categories under both Exemptions 3 and 7(A), among others; it withheld the last two categories under Exemptions 4, 6, and 7(C) only. Because the court finds that the agency properly withheld the first six categories under Exemption 7(A), the court does not reach Exemption 3 or any other exemption as to those categories. The court also finds that, with one exception, the agency appropriately invoked Exemptions 4, 6, and 7(C) as to the last two categories. The exception pertains to the names of BNPP outside counsel, as to which the agency has not established any valid personal privacy interest.

**1.**

Exemption 7(A) applies to "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings."

---

[3] Plaintiffs complain that "DOJ submits no evidence from BNPP to support any of the claims about BNPP's documents—or BNPP's interests in those documents." Pls.' Opp'n at 10. But some courts have held that such third-party evidence is hearsay and not admissible even in a FOIA case. *See Ecological Rts. Found. v. EPA*, No. 19-cv-980 (BAH), 2021 WL 2209380, at *7 (D.D.C. June 1, 2021); *Leopold*, 2021 WL 124489, at *4. The court need not take a position on that question here.

5 U.S.C. § 552(b)(7)(A); *see also CREW*, 746 F.3d at 1096. "To justify withholding, the DOJ must therefore demonstrate that 'disclosure (1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably anticipated.'" *CREW*, 746 F.3d at 1096 (quoting *Mapother v. Dep't of Just.*, 3 F.3d 1533, 1540, (D.C. Cir. 1993)). Exemption 7(A) is "temporal," and therefore any material or records must "relate[] to a concrete prospective law enforcement proceeding." *Id.* at 1097 (internal quotation marks omitted).

The agency's withholdings easily meet these elements of Exemption 7(A). The agency has established that there are law enforcement proceedings as to which the records pertain. Ex Parte O'Keefe Decl. ¶¶ 11, 14, 18. Those proceedings are ongoing. Second Ex Parte O'Keefe Decl. ¶ 6; *CREW*, 746 F.3d at 1097 (stating that the enforcement proceeding must be "pending at the time of [a court's] decision, not only at the time of the initial FOIA request"). The agency also has explained how release of each of the six categories of records would likely interfere with those proceedings. Ex Parte O'Keefe Decl. ¶¶ 18–19, 21–22.

Plaintiffs' primary response is that the "law of the case" doctrine forecloses Defendant from asserting Exemption 7(A) because the court denied summary judgment on that ground during the first round of briefing. *See* Pls.' Opp'n at 34; *see also Majuc I*, 2019 WL 4394843, at *3–4. But that argument misconstrues this court's earlier ruling. "While successive motions may be inappropriate in certain contexts, the nature of FOIA cases lends itself to such filings. . . . [A] court's decision that the agency fell short of the mark in a mendable way often includes a directive that it go back and attempt to correct any errors—e.g., by conducting another search or by releasing more documents." *Wisdom v. United States Tr. Program*, 266 F. Supp. 3d 93, 102 (D.D.C. 2017). That is precisely what occurred here. The court denied summary judgment as to Exemption 7(A) because the record, as it stood, "[did] not extinguish all genuine issues of material fact." *Majuc I*,

8

2019 WL 4394843, at *2. In particular "it [was] unclear whether there is any ongoing enforcement proceeding." *Id.* at *2–3 (questioning on the record presented whether disclosure "would interfere with an ongoing investigation, *if there is one*") (emphasis added). The court therefore denied *both parties'* motions for summary judgment. *Id.* at *4. Those denials were without prejudice. That case posture should have been apparent at the status conference held after the ruling. There, the court urged the parties to resolve their differences before they forged ahead with "another affidavit and another round of summary judgment briefing." Hr'g Tr., ECF No. 42, at 13. The court's initial denial therefore did not foreclose Defendant from reasserting Exemption 7(A). And, as discussed, the supplemental declarations provided by the agency have cured the record deficiencies previously identified by the court.

**2.**

What remains then are the last two categories of records withheld under Exemptions 4, 6, and 7(C). The court starts with Exemption 4, which allows an agency to protect "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). Records are confidential for Exemption 4 purposes if they are "customarily kept private, or at least closely held, by the person imparting" the information within the records and perhaps also "if the party receiving [the information] provides some assurance that it will remain secret." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2363, 2366 (2019). The Supreme Court in *Food Marketing* did not resolve whether the latter condition is mandatory, and so it remains "an open question . . . whether government assurance that information will remain private is necessary for such information to qualify . . . under Exemption 4." *WP Co. v. U.S. Small Bus. Admin.*, 502 F. Supp. 3d 1, 12 (D.D.C. 2020). The court need not reach this "open question" because Plaintiffs do not argue that an assurance of privacy is an essential element of

"confidentiality" under Exemption 4. *See* Pls.' Opp'n at 15–23. Accordingly, the court focuses on whether the withheld records are of the type "customarily kept private . . . by the person imparting it," in this case BNPP.

The last two categories of records withheld pursuant to Exemption 4 consist of (1) "[c]ompliance memoranda authored by BNPP employees regarding BNPP's compliance with international financial embargoes and sanctions, including U.S. sanctions pertaining to Sudan, marked as FOIA/ FOIL confidential" and (2) "[m]emoranda prepared for BNPP by outside counsel for BNPP regarding various legal issues arising in the context of embargoed and sanctioned countries with whom BNPP engaged in business, including Sudan, marked as FOIA/ FOIL confidential." Records Index at 55–56. The Records Index describes the first category of memoranda as providing "overviews of U.S. financial embargoes and sanctions of countries, including Sudan, discuss[ing] how BNPP may comply with sanctions and financial embargoes in the course of business transactions, and provid[ing] instructions pertaining to processing transactions and utilizing internal BNPP payment systems in accordance with sanctions programs and embargoes." *Id.* at 55. The second category contains "legal advice regarding requirements to adhere to U.S. financial embargoes and sanctions of countries, including Sudan, how such sanctions and embargoes impact BNPP business and transactions, and explain U.S. authority over foreign banks as it pertains to U.S.-imposed financial embargoes and sanctions programs." *Id.* at 56.

O'Keefe explains why these records were properly withheld pursuant to Exemption 4: "This information is 'commercial' within the meaning of Exemption 4, because it serves a commercial function and is of a commercial nature in that it is helpful or instrumental to BNPP's business interests and operations." O'Keefe Decl. ¶ 29. She further states that "BNPP has a

commercial interest in the information related to their business activities, as establishing and maintaining these activities requires a substantial dedication of company resources and protects the bank from potential financial and reputational damages of potential losses." *Id.*  She also details why the records are "customarily kept private, or at least closely held," by BNPP.  The records "contain large amounts of sensitive commercial information concerning . . . banking protocols and analyses of BNPP's transactions . . . assessments of BNPP's internal compliance policies with U.S. economic sanctions laws and financial embargoes, policies and protocols regarding transactional issues, and legal advice . . . regarding compliance with U.S. financial embargoes and related economic sanctions." *Id.* ¶ 32.  The disclosure of such records, O'Keefe states, would harm or competitively disadvantage BNPP in multiple ways, including by revealing to competitors and others its internal financial controls, vulnerabilities of those controls, and means of avoiding such controls.  *See id.*  And, notably, BNPP acted consistently with the non-public nature of these records:  it requested confidential treatment of the records under FOIA, marked the majority of records as confidential for purposes of FOIA, and requested that the Department of Justice not release the records publicly and maintain them in a nonpublic facility.  *Id.* ¶ 30.  Based on these representations, the court concurs in O'Keefe's assessment that "BNPP would not customarily disclose this type of information . . . to ensure that BNPP's internal business operations, financial controls, and compliance programs, as well as their related decision-making processes, are kept confidential." *Id.* ¶ 32.

The court in *Leopold v. U.S. Department of Justice* sustained the application of Exemption 4 in very similar circumstances.  There, the bank HSBC had entered into a deferred prosecution agreement arising from its failure to maintain an effective anti–money-laundering program and conduct adequate due diligence on correspondent bank accounts held on behalf of

foreign entities. *See Leopold*, No. 19-cv-3192 (RC), 2021 WL 124489, at *1. As part of the deferred prosecution agreement, HSBC was subject to an independent corporate monitor who would evaluate HSBC's efforts toward reform. *Id.* The plaintiffs in that case sought disclosure of the monitor's thousand-page report. *Id.* The court found that the report was properly withheld under Exemption 4, because it contained extensive proprietary, financial, and competitive business information about HSBC's worldwide anti–money laundering and sanctions compliance, thus demonstrating that it was not meant for public consumption. *Id.* at 6–7. The same is true here.[4]

Plaintiffs lodge four objections to the Exemption 4 withholdings. Pls.' Opp'n at 16. First, they argue "the business practices DOJ seeks to shield are in and of themselves illegal, and thus not commercial." *Id.* Such information, Plaintiffs insist, cannot be shielded from disclosure where, as here, "the 'commercial' activity *was* the criminal behavior." *Id.* at 20. The court is unpersuaded. The D.C. Circuit has not addressed whether otherwise confidential records lose Exemption 4 protection because they reflect unlawful activity, and courts in this District have taken different approaches. *Compare Pub. Citizen v. U.S. Dep't of Health & Hum. Servs.*, 975 F. Supp. 2d 81, 101 (D.D.C. 2013) ("Thus, using its ordinary meaning, the term 'commercial' is not limited only to lawful activities but also extends more broadly to any type of activity bearing on commerce."), *with Ctr. for Pub. Integrity v. U.S. Dep't of Energy*, 234 F. Supp. 3d 65, 76 (D.D.C. 2017) ("The court agrees that Exemption 4 cannot be used to shield illegal business practices under the guise of confidential business information."). The case on which Plaintiffs heavily rely for their argument, *Center for Public Integrity*, which this court decided, does not help

---

[4] *Leopold* is different from this case in one sense: there the monitor agreement acknowledged the sensitivity of HSBC's financial and other information and expressly stated that the report was intended to be non-public. *Leopold*, 2020 WL 124489, at *6. Such an assurance of secrecy is absent here, but as noted Plaintiffs do not contend that such an assurance is an essential element of "confidentiality" under Exemption 4.

them.  There, this court stated in a single line of dicta, without citation, that "Exemption 4 cannot be used to shield illegal business practices under the guise of confidential business information." *Ctr. for Pub. Integrity*, 234 F. Supp. 3d at 76.  That passing statement was made in response to the plaintiff's argument that records evincing illegal behavior could not cause competitive harm because a competitor would not adopt illegal methods.  *Id.*  That argument itself was rooted in the now-overruled requirement that, in the case of mandatory disclosures, Exemption 4 requires a showing that the disclosure likely would "cause substantial harm to the competitive position of the source of the information."  *Id.* at 74 (citing *Nat'l Parks Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974).  The Court in *Food Marketing* expressly rejected the argument that Exemption 4 required such a showing.  *See* 139 S. Ct. at 2363–65.  Therefore, this court's statement in *Center for Public Integrity* concerning records of illegal activity and Exemption 4 rests on an overturned ground, stripping it of whatever significance, if any, that dicta once held.

In any event, this court in *Center for Public Integrity* affirmed the invocation of Exemption 4, notwithstanding assertions of illegality, because "the information that Defendant designated as confidential [was] not itself unlawful or the product of inherently illegal activity.  In other words, the court [could] separate [the company's] bad acts from the information it seeks to protect." 234 F. Supp. 3d at 76.  That is the case here, too.  The last two categories of withheld records consist of internally drafted memoranda concerning BNPP's compliance program and memoranda drafted by outside counsel concerning the application of U.S. sanctions regimes to the bank.  Plaintiffs have not shown that any such records are themselves "unlawful or the product of inherently illegal activity."  They do not, for example, point to any portion of the detailed factual proffer accompanying BNPP's plea to suggest that such memoranda were used or relied upon to commit illegal acts.  *See Majuc I*, 2019 WL 4394843, at *4 (describing the factual proffer as containing

13

"details about the time, manner, and means of the bank's violations"). Indeed, O'Keefe confirms that none of the records at issue match those quoted in the factual proffer. Suppl. O'Keefe Decl. ¶ 8. Accordingly, *Center for Public Integrity* does not ultimately aid Plaintiffs' cause.

Second, Plaintiffs argue that "DOJ's conclusory and boilerplate recitations fail to substantiate that the information is indeed commercial and treated as confidential." Pls.' Opp'n at 16. "DOJ does not," Plaintiffs maintain, "explain how the withheld information is related to BNP's business activities, what business activities it is referring to, what BNP resources are used to protect it, or how DOJ would have knowledge of such facts." *Id.* at 20. But in making that argument, Plaintiffs focus exclusively on the representations made in the Records Index and elide those made by O'Keefe in her declarations. *Id.* O'Keefe addresses each of the topics that Plaintiffs insist are missing. And the court already held those representations to be sufficient to establish the factual basis for Exemption 4.

Third, Plaintiffs urge that the "information is too outdated to have meaningful commercial consequences." *Id.* at 16. Disclosure would not harm BNPP, they say, "because there would be limited, if any, commercial consequence if out of date policies and procedures were disclosed." *Id.* at 21. That argument, however, rests on the assumption that to satisfy Exemption 4 an agency must demonstrate that release would cause harm to the records' producer, and as already discussed, *Food Marketing* rejected the need to make such a showing. *See* 139 S. Ct. at 2363–65; *Humane Soc'y Int'l v. U.S. Fish & Wildlife Serv.*, 394 F. Supp. 3d 67, 74 (D.D.C. 2019) (observing that, after *Food* Marketing, "Exemption 4 does not depend on whether disclosure of the information

would cause substantial competitive harm, but whether the entity sharing the information typically kept it private"). [5]

Finally, Plaintiffs contend that "certain records appear to contain information that is either in the public record or is of a type deemed noncommercial by this Court." Pls.' Opp'n at 16. Specifically, Plaintiffs assert that, to the extent the records relate to embargoes and sanctions regimes, the records "simply describe[] federal law and policy" and therefore, their contents are inherently reflected in public documents. *Id.* at 23.[6] This argument, however, fundamentally mischaracterizes what was withheld under Exemption 4. The withheld records are not just regurgitated pages from the U.S. Code or Treasury regulations. They are memoranda prepared by employees and outside counsel that specifically address BNPP's compliance program and its conformance with U.S. sanctions and embargo laws and regulations. Such records are not "inherently reflected in public documents."

To sum up, the court finds that the agency's withholding of the final two categories of records pursuant to Exemption 4 was proper.

**3.**

Next, the court considers the invocation of Exemptions 6 and 7(C) to withhold certain information appearing within the last two categories of records. This includes the "names and identifying information of BNPP employees" and the "names and identifying information of outside counsel hired by BNPP." Records Index at 55–56.

---

[5] If what Plaintiffs mean to say is that outdated records do not qualify as "commercial" for purposes of Exemption 4, they have not made that argument. The main case on which they rely, *Center for Auto Safety v. U.S. Dep't of Treasury*, expressed doubt that "dated, six-year-old financial information could be used by . . . competitors to cause . . . harm" in the context of analyzing whether the objectors to release had made a showing of "substantial competitive harm," not that the information was not commercial. 133 F. Supp. 3d 109, 129–32 (D.D.C. 2015).

[6] Plaintiffs also assert that some records appear to be noncommercial, but those arguments relate to categories of records already determined to be subject to Exemption 7(A), *see* Pls.' Opp'n at 23, so the court need not reach this contention.

15

Exemption 6 exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 7(C) permits withholding of "records or information compiled for law enforcement purposes" where disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). As the court agrees that Exemption 7(C) applies, there is no need to consider the more stringent standard under Exemption 6. *See Roth v. U.S. Dep't of Just.*, 642 F.3d 1161, 1173 (D.C. Cir. 2011).[7]

D.C. Circuit "precedents give strong support to Government decisions to withhold names and identifying information from law enforcement records." *Schrecker v. U.S. Dep't of Just.*, 349 F.3d 657, 666 (D.C. Cir. 2003). That is because "the mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation." *Id.* (internal quotation marks omitted). "Therefore, persons involved in law enforcement investigations—witnesses, informants, and the investigating agents—have a substantial interest in seeing that their participation remains secret." *Id.* (internal quotation marks omitted). On the other hand, "[t]he countervailing public interest in disclosure of the names and other identifying information of those appearing in the responsive documents" is usually "weak." *Id.* That is the case here, at least with respect to the BNPP employees' names and identifying information.

Plaintiffs nevertheless insist that withholding employee names and identifying information was improper. They contend that BNPP employees have diminished expectation of privacy

---

[7] In view of O'Keefe's representation that all the withheld records "consist entirely of business records submitted by BNPP to the Department of Justice during the course of the Department's investigation into and prosecution of BNPP for violations of U.S. laws," O'Keefe Decl. ¶ 25, there is no question the records at issue were "compiled for law enforcement purposes." *See Bartko v. U.S. Dep't of Just.*, 898 F.3d 51, 64 (D.C. Cir. 2018) ("To qualify as law-enforcement records, the documents must arise out of investigations which focus directly on specifically alleged illegal acts . . . which could, if proved, result in civil or criminal sanctions.") (internal quotation marks omitted). Plaintiffs do not argue otherwise. *See* Pls.' Opp'n at 25–33.

because BNPP was found guilty of wrongdoing. Pls.' Opp'n at 31–33. Not surprisingly, Plaintiffs cite no case that stands for the proposition that an employee's privacy interest in criminal investigative files is reduced by virtue of their *employer's* admission of guilt. Additionally, Plaintiffs contend that the disclosure of employee information is required to "evaluate the thoroughness and efficiency of DOJ's operations." *Id.* at 30; *see also id.* (asserting that disclosure "can illuminate DOJ's zeal or tardiness"). But the D.C. Circuit rejected that argument long ago. *See Schrecker*, 349 F.3d at 666.

There is one exception to the foregoing conclusion: the agency cannot withhold the names and professional identifying information of BNPP's outside counsel. This court so held in a similar case and will apply that determination here. *See King & Spalding, LLP v. U.S. Dep't of Health & Hum. Servs.*, 395 F. Supp. 3d 116, 122 (D.D.C. 2019) (holding that disclosure of outside counsel's name to a confidential source would not result in "an unwarranted invasion of personal privacy" because lawyers "have little or no privacy interest in their 'representational capacity'" (quoting 5 U.S.C. § 552(b)(7)(C))).

### 4.

Next, the court considers Plaintiffs' global argument that some records or portions of records must be released because they are in the public domain. Pls.' Opp'n at 11–14. "[A] plaintiff asserting a claim of prior disclosure must bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld." *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983). Perhaps with one exception, Plaintiffs here have not met their burden. Plaintiffs have only pointed to generic descriptions in the Records Index that they suspect match documents identified in the factual proffer. See Pls.' Opp'n at 13–14. The only exception is to a memorandum that is quoted, in part, in BNPP's factual proffer. *See id.* at

13. But O'Keefe has attested that "[n]one of the records withheld in the September and November 2020 interim responses"—which are the only responses presently at issue—"match those quoted in the Statement of Facts" associated with BNPP's plea agreement. Suppl. O'Keefe Decl. ¶ 8. She also has represented that "[n]one of the names listed in Plaintiffs' opposition appear within the records withheld by the Criminal Division that are at issue in this briefing." *Id.* ¶ 10. The court accepts these representations and therefore finds that the agency has met its ultimate burden of persuasion that none of the withheld records are in the public domain. *See Davis v. U.S. Dep't of Just.*, 968 F.2d 1276, 1280 (D.C. Cir. 1992).

### 5.

And finally, the court finds that Defendant has met its segregability obligations. O'Keefe has sufficiently established that there is no segregable information within the withheld records. *See* O'Keefe Decl. ¶ 50; O'Keefe Ex Parte Decl. ¶ 23.

### III.

For the foregoing reasons, Defendant's Motion for Summary Judgment, ECF No. 70, is granted. The parties shall submit a Joint Status Report by February 11, 2022, which proposes a course for further proceedings in this matter, if required.

Dated: January 28, 2022

Amit P. Mehta
United States District Court Judge